# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * | MDL NO. 2179 |
| | * | |
| | * | SECTION: J |
| | * | |
| | * | |
| | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |
| Kip Plaisance, Jason Perkins, Camille Warren, Christian Pizani, Max Plaisance, Benjamin Judah Barbee, Cornelius Divinity, Janice Brown, Carlton Caster, George Baker, and Duffy Hall, | * | No. |
| | * | |
| | * | |
| | * | SECTION: J |
| | * | |
| | * | |
| Plaintiffs, | * | HONORABLE CARL J. BARBIER |
| | * | |
| v. | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | | |

# MEDICAL CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

PARTIES ...................................................................................................... 3

    A.  Plaintiffs .......................................................................................... 3

    B.  Defendants ....................................................................................... 7

    C.  Reservation; Joint, Several, and Solidary Liability ................................ 9

JURISDICTION AND VENUE ...................................................................... 10

FACTUAL ALLEGATIONS .......................................................................... 12

    A.  The *Deepwater Horizon* Catastrophe .................................................. 12

    B.  The Response Effort and the Use of Chemical Dispersants ................. 16

    C.  Plaintiffs' Exposure to Oil and Harmful Chemicals and
        the Resulting Injuries and Damages .................................................. 21

    D.  Defendants' Knowledge of the Risks ................................................. 23

    E.  Defendants' Willful and Wanton Conduct .......................................... 24

CLASS ACTION ALLEGATIONS ................................................................. 25

    A.  Numerosity – F.R.C.P. 23(a)(1) ........................................................ 28

    B.  Commonality – F.R.C.P. 23(a)(2) ...................................................... 28

    C.  Typicality – F.R.C.P. 23(a)(3) .......................................................... 30

    D.  Adequacy of Representation – F.R.C.P. 23(a)(4) ................................. 30

    E.  Class Certification Under F.R.C.P. 23(b)(3) –
        Predominance and Superiority ........................................................... 31

CAUSES OF ACTION .................................................................................. 32

    A.  Negligence Under General Maritime Law ........................................... 32

    B.  Gross Negligence Under General Maritime Law .................................. 35

    C.  Negligence *Per Se* Under General Maritime Law and Federal Law ..... 36

    D.  Medical Monitoring Claim Under General Maritime Law ..................... 37

    E.  Punitive Damages ........................................................................... 38

PRAYER FOR RELIEF ................................................................................. 40

i

## INTRODUCTION

On April 20, 2010, an explosion on board the oil vessel *Deepwater Horizon* in the Gulf of Mexico marked the beginning of what would become the most pervasive and devastating environmental disaster in the history of the United States.   The explosion resulted in an oil spill of unprecedented proportions and an oil slick that grew exponentially, depleting and destroying marine and coastal environments and estuarine areas in the Gulf of Mexico, Louisiana, Mississippi, Alabama, and the Florida panhandle. In an ill-conceived effort to contain and to remediate the spill, massive amounts of chemical dispersants were sprayed from the air, at the surface of the Gulf and beneath the surface of the water.   Beaches, marshes, and wetlands fouled by oil and chemicals have been the focus of a variety of remedial efforts to remove the hazardous materials from these fragile areas.   Although the leaking well is now capped, the disastrous effects of the spill on the public health remain and likely will continue for decades.

Accordingly, Plaintiffs, on behalf of themselves and a class of others similarly situated, by and through Interim Class Counsel and Proposed Class Counsel identified herein, respectfully state as follows:

1.      This Medical Class Action Complaint asserts claims for exposure-related personal injury and/or medical monitoring relief on behalf of the Class defined in the Class Allegations section of this Complaint (the "Class").   As to other claimants and/or claims not included in the Class, the previously filed First Amended Master Complaint for the B3 Bundle[1] (Rec. Doc. 1812) continues in effect and is not superseded by this Complaint.

---

[1] Plaintiffs have filed a motion to amend the First Amended Master Complaint for the B3 Bundle (Rec. Doc. 5718).  That motion remains pending.  If and when the Court grants

2.      This Medical Class Action Complaint does not constitute a waiver or dismissal of any claims or actions not included in this Complaint.  More specifically, this Complaint describes the conduct of, *inter alia*, Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC, Triton Asset Leasing GmbH, Halliburton Energy Services, Inc., and Sperry Drilling Services (formerly Sperry Sun Drilling Services) in connection with the *Deepwater Horizon* incident.  These Transocean and Halliburton entities are named Defendants in the First Amended Master Complaint for the B3 Bundle (Rec. Doc. 1812) (hereinafter the "operative B3 Master Complaint").  Plaintiffs and the Class hereby reserve any and all claims they may have against these or any other Transocean and Halliburton entities, including, but not limited to, those asserted in the operative B3 Master Complaint, and reserve the right to amend this or other Complaints to assert such claims or name such entities as defendants.

3.      This Complaint makes allegations of, and places Defendants on notice that, Plaintiffs seek certification of the Class described and defined herein.  Plaintiffs seek to maintain this action as a class action, and/or the class certification of particular issues herein, under Rule 23 of the Federal Rules of Civil Procedure, including, as appropriate, Rule 23(a)(1)-(4) and (b)(3).

4.      This Complaint does not allege, nor is it intended to allege, a cause of action for any claims for non-exposure-based physical or bodily trauma injury (which shall not include any heat-related injury) that arose from, was due to, resulted from or was related to, directly or indirectly, the *Deepwater Horizon* oil spill, or wrongful death

---

Plaintiffs' motion, the Second Amended Master Complaint for the B3 Bundle shall become the operative complaint for the B3 Bundle.

and/or survival actions as a result of such non-exposure-based physical or bodily trauma injury.

**PARTIES**

**A.     Plaintiffs**

5.      Plaintiffs are individuals who were injured as a result of exposure to oil and/or oil-dispersing chemicals and/or decontaminants by virtue of their employment as workers cleaning the spill or because of their residence in certain coastal areas near the waters affected by the spill.  Plaintiffs bring this action as proposed representatives of the Class defined herein.

a.      Kip Plaisance

Kip Plaisance lives in Golden Meadow, Louisiana, and is the owner of a fishing charter boat company called Tidewater Charters.  In May 2010, he started working on oil spill clean-up in the Vessels of Opportunity ("VoO") program.  Mr. Plaisance worked from June 1, 2010 through August 6, 2010.  His job was to, *inter alia*, lay and unload boom and spot for oil and oiled wildlife.  During the course of his work, Mr. Plaisance experienced headaches, nausea, vomiting, and respiratory problems.      On or about July 29, 2010, Mr. Plaisance had severe vomiting and shortness of breath, and he sought treatment at an onsite BP medical facility.  He was treated and sent home the same day.

b.      Jason Perkins

Jason Perkins is a resident of Baton Rouge, Louisiana.  He was working for Copeland Electrical as a safety supervisor at the time of the *Deepwater Horizon* oil spill. Mr. Perkins was called up by the Louisiana National Guard to assist with spill response activities and was stationed in Venice, Louisiana.   Along with several other Guard

members, Mr. Perkins was responsible for constructing oil barriers along the coastline to prevent oil from washing ashore.  These duties often required Mr. Perkins to stand waist-deep in oily water.  Mr. Perkins worked in Venice for approximately ten days, at which time he began to develop rashes.  He sought medical treatment, and the rashes no longer persist.

       c.     Camille Warren

Camille Warren is a resident of Gulf Shores, Alabama, and lives within one-half mile from the beach.  Ms. Warren developed respiratory problems in the month of May 2010.  She was treated by a physician for her condition on several occasions between May and August 2010.  These conditions have resolved.

       d.     Christian Pizani

Christian Pizani is a resident of Grand Isle, Louisiana, and specifically on the barrier island of Cheniere Caminada.  Ms. Pizani has lived in that location from April 20, 2010 to the present.  During the summer, she was exposed to, *inter alia*, oil fume odors.  She periodically experienced headaches, itchy eyes, and post-nasal drip.

       e.     Max Plaisance

Max Plaisance is a resident of Golden Meadow, Louisiana.  He was a deckhand on a Vessel of Opportunity vessel from June 22, 2010, to August 5, 2010.  The vessel laid boom, collected oily boom, and spotted for oil.  Mr. Plaisance began to feel ill almost immediately upon commencing work, experiencing symptoms of nausea, vomiting, and severe respiratory difficulties.  Around the 20th of July, 2010, Mr. Plaisance was seen by a medic at the onsite BP medical station because he was vomiting from exposure to oil fumes.  Mr. Plaisance also developed asthma, a condition he did not have prior to his

work on the oil spill.  Since August 2010, Mr. Plaisance has been under the care of a doctor for his respiratory condition, and he is dependent on an inhaler from time to time. He still suffers from asthma to this day

   f. Benjamin Judah Barbee

  Benjamin Judah Barbee is a resident of Valparaiso, Florida.  Prior to the oil spill, he was a charter boat captain in and around Destin, Florida.  When remediation efforts began, Mr. Barbee commenced work for Windes Brothers & Associates on a spotter boat, and he also collected tar balls on the beach.  Mr. Barbee developed headaches and breathing difficulties during his clean-up responsibilities, but he did not seek medical care for his condition.

   g. Cornelius Divinity

  Cornelius Divinity lives in Marrerro, Louisiana.  In late April 2010, Mr. Divinity was hired by Down South, Inc., and stationed in Venice, Louisiana.  His job was to, *inter alia*, unload oily boom from, and load clean boom onto, vessels responding to the spill. As a result of his exposure to oil and/or dispersants, he experienced blurred vision, shortness of breath, and migraine headaches.  On May 29, 2010, Mr. Divinity reported his illness to his supervisor, who sent him to the BP onsite medical station.  From there, Mr. Divinity was transported to Terrytown, Louisiana, where he was met by his wife, who took him to West Jefferson Medical Center.  Mr. Divinity was treated and sent home.

   h. Janice Brown

  Janice Brown is a resident of Fort Walton Beach, Florida.  She lived along the beach from early April 2010 to December 2010.  Following the oil spill, Ms. Brown

observed that there was a distinct smell in the air that did not exist prior to the spill.  In July 2010, she began to experience, *inter alia*, nosebleeds and headaches.  Her symptoms persisted for months before she finally sought treatment from a medical professional.  Ms. Brown also volunteered to be part of the Gulf Long Term Follow-Up Study conducted by the National Institutes of Health, and in that connection was subject to blood, urine, and breathing tests.

### i.    Carlton Caster

Carlton Caster is a resident of Mobile, Alabama.  He took work collecting tar balls along the beach in Gulf Shores, Alabama, on June 19, 2010.  Five days later, Mr. Caster became ill with symptoms of heat stroke/heat exhaustion and was taken to the BP medical station onsite.  The attending medic sent Mr. Caster by ambulance to South Baldwin Medical Center, where he was released after treatment the same day.

### j.    George Baker

George Baker is a resident of Harvey, Louisiana.  From late April 2010 through August 2010, he was employed by Southern Environmental, a clean-up company.  Mr. Baker was tasked with laying boom in marsh areas, and he would frequently stand waist deep in oily water to collect boom around the barrier island.  Mr. Baker began to develop severe bumps and boils on his skin, and he experienced conditions of dizziness and nausea.  On August 5, 2010, his skin condition had become so severe that he nearly fainted at work and was taken to a physician provided by the Army Corps of Engineers.  He was then treated at Ochsner Medical Center WestBank, where he was diagnosed with, *inter alia*, folliculitis.  He remains under the care of a physician for this dermal condition today.

k.    Duffy Hall

Duffy Hall worked for Knights Marine & Industrial Services, Inc. installing barriers to protect the wetlands near Gauthier, Mississippi.  Mr. Hall was exposed to oil in the water while he was erecting these barriers.  He experienced burning and swelling in his eyes.  Mr. Hall was diagnosed with chemical keratitis and remains under the care of a physician for his condition to this day.

**B.    Defendants**

6.    Defendant BP Exploration & Production Inc. ("BP Exploration") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP Exploration was a leaseholder and the designated operator in the lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo," where the oil spill originated.[2]  BP Exploration was designated as a "responsible party" by the U.S. Coast Guard under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2714.

7.    Defendant BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  BP America was the party to the drilling contract with Transocean Ltd. for the drilling of the Macondo well by the *Deepwater Horizon* vessel.

8.    Defendant BP p.l.c. is a British public limited company with its corporate

---

[2] The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "blocks," and then auctions the rights to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2010; however, it is referred to as the MMS throughout this document.

headquarters in London, England.  BP p.l.c. is the global parent company of the worldwide business operating under the "BP" logo.  BP p.l.c. is one of the world's largest energy companies, with over 80,000 employees and $239 billion in revenues in 2009.  BP p.l.c. operates its various business divisions, such as the "Exploration and Production" division in which BP Exploration and BP America fall, through vertical business arrangements aligned by product or service groups.  BP p.l.c.'s operations are worldwide, including in the United States.  Defendants BP Exploration and BP America are wholly-owned subsidiaries of BP p.l.c. and are sufficiently controlled by BP p.l.c. so as to be BP p.l.c.'s agents in Louisiana and the U.S. more generally.

9.  BP p.l.c. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development.  A sampling of BP p.l.c.'s contacts with the U.S. are as follows:  (a) BP p.l.c.'s American Depository Shares are listed on the New York Stock Exchange ("NYSE") and BP p.l.c. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP p.l.c. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP p.l.c.'s fixed assets are located in the U.S. or the European Union; and (e) BP p.l.c. reports having 2,000 U.S.-based employees in non-Exploration and Production, non-Refining and Marketing BP entities.

10.  BP Exploration, BP America and BP p.l.c. are generally referred to herein collectively as "BP."  As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

C.       **Reservation; Joint, Several, and Solidary Liability**

11.       Transocean Ltd., Transocean Offshore Deepwater Drilling, Inc., Transocean Deepwater, Inc., Transocean Holdings, LLC, Triton Asset Leasing GmbH (collectively, "Transocean"), are named Defendants in the operative B3 Master Complaint.

12.       Halliburton Energy Services, Inc. and its division Sperry Drilling Services (formerly Sperry Sun Drilling Services) (collectively, "Halliburton") are named Defendants in the operative B3 Master Complaint.  Halliburton provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the *Deepwater Horizon*, as well as onshore engineering support for those operations. Halliburton was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. Sperry Drilling Services was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil, and Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pits fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations.

13.       Plaintiffs, on behalf of themselves and the Class defined herein, reserve all rights, claims, and/or causes of action against Transocean and Halliburton.

14.       BP, Transocean, and Halliburton are jointly, severally, and/or solidarily liable under various principles of maritime and/or Federal tort law.

## JURISDICTION AND VENUE

15.     Jurisdiction exists before this Court pursuant to Article III, Section 2 of the United States Constitution, which empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction."

16.     In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333, and the Admiralty Extension Act, 46 U.S.C. § 30101.

17.     The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Plaintiffs hereby designate this case as an admiralty or maritime case, and request a non-jury trial, pursuant to Rule 9(h).

18.     This Court has personal jurisdiction over BP Exploration and BP America because each is registered to do business in Louisiana, does business in Louisiana, and has a registered agent in Louisiana.

19.     This Court may exercise personal jurisdiction over BP p.l.c. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, the federal long-arm jurisdiction provision, because claims in this action arise under federal law, the exercise of jurisdiction over BP p.l.c. is consistent with the United States Constitution and laws, and BP p.l.c. will be served with a summons and this Complaint and has been served with a summons on the operative B3 Bundle Master Complaint.

20.     This Court also has jurisdiction over BP p.l.c. pursuant to Louisiana's long-arm statute (La. Rev. Stat. Ann. § 13:3201(B)), in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.  Plaintiffs' causes of action arise out of wrongful conduct committed by BP p.l.c., directly or indirectly by its agents, which caused injury

or damage in Louisiana by an offense or quasi-offense committed through an act or omission outside of Louisiana.  These acts or omissions took place both before the blowout resulting in the oil spill, which is described more fully below, and in the negligent conduct of BP p.l.c. after the blowout in attempting to contain the oil spill.  BP p.l.c. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana.  BP p.l.c. has had continuous and systematic contacts with Louisiana (and with the United States more generally) and has been served with a summons on the operative B3 Bundle Master Complaint.

21.     In addition, this Court also has personal jurisdiction over BP p.l.c. under agency principles because BP p.l.c.'s agents, BP America and BP Exploration, do business in Louisiana.  In BP p.l.c.'s Annual Report for 2009, in which it presents a consolidated financial statement that includes BP America and BP Exploration, BP p.l.c. states that it "controls" both BP America and BP Exploration, among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities . . . ."

22.     BP p.l.c.'s direct, joint and/or assumed responsibility and/or liability for safety and well control, both before and/or after the explosions and blowout on April 20, 2010, is further evidenced by the announcement of the Macondo Project on the BP website hosted and copyrighted by BP p.l.c., the publication of information concerning the casualty and spill on the BP website hosted and copyrighted by BP, the express and/or implied acceptance of responsibility for safety of BP operations in North America and the Gulf of Mexico in statements by officers of BP p.l.c., the presence (upon information and

belief) of a BP p.l.c. officer or employee on the *Deepwater Horizon* for the celebration that occurred shortly before the explosions and fire, the direct participation of BP p.l.c. employees in the post-casualty investigation, the direct participation of BP p.l.c. officers and employees in the governmental post-casualty investigations, the direct participation of BP p.l.c. officers and employees in the post-casualty well-control efforts, and the direct participation of BP p.l.c. in the establishment and/or funding of the Escrow Fund and/or Gulf Coast Claims Facility.

23.    Venue is appropriate in this District under 28 U.S.C. § 1391, because the events or omissions giving rise to the claims asserted herein occurred in this District. Venue is also appropriate in this District consistent with 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multidistrict Litigation, *see In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 731 F. Supp. 2d 1352 (J.P.M.L. 2010), as well as this Court's Pretrial Order No. 20 (Rec. Doc. 904), which allows plaintiffs to directly file complaints arising out of the *Deepwater Horizon* incident in this District.

## FACTUAL ALLEGATIONS

A.    **The *Deepwater Horizon* Catastrophe**

24.    The *Deepwater Horizon* was an ultra-deepwater dynamic positioned semi-submersible oil vessel built in 2001.  It was one of the largest vessels of its kind.

25.    BP leased the *Deepwater Horizon* through September 2013 to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the Outer Continental Shelf off the coast of Louisiana.

26.    On April 20, 2010, and as described in greater detail in the First Amended B1 Master Complaint (Rec. Doc. 1128) (whose factual allegations are incorporated fully

by reference herein), workers on the *Deepwater Horizon* oil rig lost control of the Macondo well just after the final cementing work was completed.  During the course of the cementing work, an explosion occurred on the *Deepwater Horizon* and it caught fire.

27.     The explosion and fire caused the deaths of 11 people and injuries of many other workers on the vessel.  After burning for two days, the vessel sank to the ocean floor.

28.     The *Deepwater Horizon* had been connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* tipped into the sea, it pulled the riser down with it, bending and breaking the pipe.  Oil flowed out from the now-open end of the riser, as well as through two breaks along its length.  An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, causing the blown-out well to spew oil into the Gulf waters (the "Oil Spill").

29.     Crude oil was discharged before the *Deepwater Horizon* finally sank on April 22, 2010, and the rate of discharge increased once the *Deepwater Horizon* sank to the ocean floor.

30.     After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill.  Government investigators have found BP's initial leak estimate of 1,000 barrels per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day.  Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

31.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer space, at times covering tens of thousands of square miles, and spreading with the wind and currents towards the Gulf States' coastlines.

32.     Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Under water, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

33.     The oil spewed from the well for over twelve weeks until BP finally capped the well on July 15, 2010.  Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

*The Crude Oil*

34.     The crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

35.     Crude oil contains benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zinc, all of which can harm human health.

36.     Chemicals such as benzene, PAHs and many other chemicals in crude oil are toxic and volatile, moving from the oil into the air.  Once airborne, they can blow

over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors.

37.     Dermal exposure to certain VOCs in crude oil can cause, *inter alia*, redness, swelling, irritation, rashes and blisters on the skin and mucous membranes. Inhalation exposure to certain VOCs in crude oil can cause, *inter alia*, ocular redness, soreness, watering and itching.  Inhalation exposure to certain other VOCs in crude oil can cause, *inter alia*, coughing, throat irritation, congestion, shortness of breath and wheezing.  Inhalation exposure to other VOCs in crude oil can also affect, *inter alia*, the nervous system causing, among other things, nausea, vomiting, dizziness, irritability, confusion, and weakness of extremities.  Ingestion of food or water containing VOCs from crude oil can cause, *inter alia*, nausea, vomiting, and diarrhea.

38.     According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen.  Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

39.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, aplastic anemia (a precursor of leukemia), chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells.  Long-term low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

40.     As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human services, in her June 15, 2010 testimony before Congress:  "Oil can remain toxic in the environment for years."

**B.     The Response Effort and the Use of Chemical Dispersants**

41.     The OPA imposes liability upon a "responsible party for a . . . facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs.  33 U.S.C. § 2702.

42.     The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

43.     After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

44.     In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.  This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

45.     As part of its offshore containment response program, BP directed the use of vessels to, *inter alia*, recover oil coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct in-*situ* burning of oil that reached the surface of the water.  BP also employed vessels to tow and deploy booms—floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

16

46.     In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

47.     Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

48.     Among other dispersants, BP applied a highly toxic form of chemical dispersant called Corexit.  BP used both Corexit® 9500 and Corexit® EC9527A.

49.     The Material Safety Data Sheet ("Data Sheet")—a form that sets forth the properties of a particular substance, including its toxicity and health effects—for Corexit® 9500 indicates that it contains hazardous substances, that it is harmful to human health, and that dermal exposure, inhalation, and ingestion should be avoided.  The Data Sheet further states that Corexit® 9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled.  If ingested, it may cause chemical pneumonia.

50.     The Data Sheet for Corexit® EC9527A also indicates that it contains hazardous substances, it is harmful to human health, and that dermal exposure, inhalation, and ingestion should be avoided.  The Data Sheet further states that Corexit® EC9527A is an eye and skin irritant and, if inhaled, may irritate the respiratory tract.  If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

51.     In addition, Corexit® EC9527A contains 2-butoxyethanol, also known as EGBE.  Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver.  EGBE may be carcinogenic to humans.  It is an eye, nose, and

throat irritant.  It can cause nausea, vomiting, diarrhea, and abdominal pain.  Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to the male and female reproductive systems in animals.

52.     Both of these Corexit® products also contain non-specified organic sulfonic acid salt, which is "moderately toxic," as well as propylene glycol, a chemical with solvent properties.  Propylene glycol is a mild irritant, and exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat, and lung irritation.  Some individuals are allergic to propylene glycol and those with eczema may be at higher risk.  Exposure may cause erythema, edema, induration, and other skin problems.

53.     Upon information and belief, BP also authorized the application of other chemical dispersants, including PES51™ and OMI-500®, to near-shore and onshore areas, as well as to contaminated vessels and containment equipment, to disperse the oil and clean vessels and equipment.

54.     The Data Sheet for PES51™ indicates that it should be handled with gloves, that it is an irritant, and that dermal exposure and ingestion should be avoided.

55.     The Data Sheet for OMI-500® indicates that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.  Among other effects, OMI-500® can be irritating to skin and eyes and may cause irritation of the respiratory tract, typically experienced as nasal discomfort and discharge, possibly with chest pain and coughing.  Headache, nausea, vomiting, dizziness, and drowsiness may occur.  Exposure may also cause mild to severe irritation experienced as discomfort or

pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva.

56.     In summary, the dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness;  irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

57.     Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants to the resulting oil slick and sheens on the surface of the Gulf.  Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

58.     BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants on the surface of the Gulf.

59.     According to the Aerial Dispersants Operations -- Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and 8 spotter aircraft.  At

least four spray planes left from Houma, Louisiana.  At least six spray planes left from Stennis International Airport in Mississippi.  Upon information and belief, aerial dispersant sorties also would leave from airfields in Florida and were conducted and orchestrated by BP.

60.     Generally, the United States Oil Spill National Contingency Plan permits spraying of chemical dispersants at least 3 miles offshore or where the water is at least 10 meters deep.  The Coast Guard's Federal On Site Coordinator (the "On Site Coordinator") had to approve BP's requests to use chemical dispersants.

61.     On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP to identify and begin using chemical dispersants less toxic than Corexit® within the next 24 hours.

62.     On May 20, 2010, BP objected to this order and notified the EPA that it would continue using Corexit®.

63.     BP's use of chemical dispersants then skyrocketed: on May 22, 2010, BP used 45,000 gallons of dispersant and on May 23, 2010, it used 70,000 gallons of dispersant.

64.     Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.  It relied on Corexit® 9500 thereafter.

65.     On May 26, 2010, the EPA directed BP to reduce overall use of Corexit® by 75% and to stop using chemical dispersants on the water's surface except in rare cases where an exemption was sought in writing from and approved by the On Site Coordinator.

66.     BP thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.  According to the Aerial Dispersants Operations – Houma Status Report, by June 26, 2010, BP had applied 933,023 gallons of dispersant by aerial application.  As of the same date, BP had ordered the application of dispersant by 386 flights, or sorties, and had covered approximately 291 square miles of the Gulf with dispersant.

67.     To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

**C.      Plaintiffs' Exposure to Oil and Harmful Chemicals and their Resulting Injuries and Damages**

68.     Clean-Up Workers, as defined in Paragraph 85, were hired by BP and other BP clean-up and response contractors to clean up beaches, marshes, wetlands and other onshore areas.  Many Clean-Up Workers' primary tasks were to, *inter alia*, lay and haul oil containment boom, install other barriers, collect tar balls, remove polluted sand contaminated with oil and/or dispersants, assist with in-*situ* burning, spray and clean vessels that came into contact with oil, dispersants, and other harmful chemicals resulting from the Oil Spill, decontaminate oiled wildlife, and transport contaminated boom and other clean-up equipment and other Clean-Up Workers.

69.     As part of this effort, Clean-Up Workers came into contact with crude oil, chemical dispersants and oil/chemical mixtures.  Even more disturbing, BP's aerial spray planes negligently and/or intentionally sprayed chemical dispersants on the water despite the presence of boats and their crews in the vicinity of the spraying.

70.     Upon information and belief, many Clean-Up Workers were not outfitted with respirators or equivalent safety devices.  Some attempted to use respirators while

21

working, but BP prevented them from doing so and threatened them with loss of their clean-up jobs if they did not abide by the instruction.

71.     Clean-Up Workers were exposed to oil and dispersants and other harmful chemicals by, *inter alia*, inhalation, ingestion, dermal exposure, and through contact with the eyes from spray mist.  Many of the chemicals in crude oil and the dispersants to which the Clean-Up Workers were exposed target the same organs in the human body, and this increases the risk and may also increase the severity of harm.  The dispersants that were used also can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.  Moreover, the odors emanating from the oil and/or the dispersants are foul, and the fumes are harmful.

72.     The negative health effects caused by exposure to oil, dispersants, and/or some mixture of the two are varied and can cause a wide range of diseases and conditions.  Some of these diseases, conditions, and symptoms may be evident immediately or within several days, and others can appear months or years later.

73.     Residents of Zones A and B, as defined in Paragraphs 86 and 87, due to the proximity of their homes to the Gulf of Mexico, and the actions and omissions by BP, have been exposed to oil, dispersants, and other harmful chemicals and to fumes and odors from those chemicals.

74.     Many Clean-Up Workers and residents of Zone A and B complained of rashes, lesions and burns resulting from exposure to oil, dispersant, and/or some mixture of the two.  Many experienced and/or are continuing to experience, *inter alia*, headaches, nausea, vomiting, respiratory difficulty, rashes and eye irritation.

75.     Plaintiffs, and the Class described below, have suffered and/or will suffer injuries and damages, including, *inter alia*, exposure to dangerous chemicals, physical injuries and diseases, accompanying physical, mental and emotional pain, suffering and anguish, the need for medical monitoring, costs and inconvenience of obtaining past and future medical treatment for exposure to chemicals, and increased risk and fear of future disease as a result of exposure to oil, dispersants, and/or oil and dispersant mixtures.

76.     All Plaintiffs, like all members of the Class, have been placed at risk of developing additional diseases over the decades and becoming saddled with the financial burden, inconvenience, and emotional strain of monitoring their compromised health. Plaintiffs, like many members of the Class, have already manifested injuries and illnesses associated with exposure to chemicals in the environment resulting from the Oil Spill.

**D.      BP's Knowledge of the Risks**

77.     As early as May 2010, federal regulators at the Occupational Safety and Health Administration ("OSHA") repeatedly raised concerns with BP over significant deficiencies in BP's Oil Spill response operations relating to worker safety.  OSHA regulators remained frustrated, however, that BP did not address the most serious problems.

78.     BP, aware of the risks that response vessels would face, failed to provide adequate training and vessel inspections and ignored worker safety concerns, even in the face of OSHA warnings and notification by the U.S. Department of Health and Human Services that vessel workers in its Vessels of Opportunity ("VoO") program, as well as other offshore and onshore Clean-Up Workers, were complaining of illnesses after being exposed to oil and dispersants.

23

79.     At all times relevant to this litigation, BP knew or should have known that:

a.      crude oil contains chemicals hazardous to human health;

b.      chemical dispersants contain chemicals hazardous to human health;

c.      Plaintiffs were entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; and

d.      Plaintiffs should have been provided proper protective clothing and respirators when engaged in Oil Spill clean-up activities.

**E.      BP's Willful and Wanton Conduct**

80.     BP focused primarily on profit and disregarded public and environmental

health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon*

by, among other things:

a.      performing a critical well pressure test with untrained and unqualified personnel and callously ignoring and/or misinterpreting abnormal "red flag" pressure test results;

b.      using a well design with too few barriers to gas flow;

c.      failing to use a sufficient number of "centralizers" to prevent channeling during the cement process;

d.      failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

e.      failing to run a cement bond log to evaluate the integrity of the cement job;

f.      failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

g.      using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

h.      grossly inadequate maintenance, and reckless and improper operation and use of the blowout preventers appurtenant to the *Deepwater Horizon*;

i. failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

j. failing to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill; and

k. failing to use reasonably safe dispersant chemicals in the attempt to respond to the Oil Spill.

81. BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of life; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

82. In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality.  As such, BP increased the magnitude of, and the damage caused by, the spill by willfully, wantonly, and/or recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states.

83. BP, by its conscious and/or deliberate unreasonable acts and/or omissions complained of herein, displayed gross negligence, reckless indifference, willfulness, and/or wantonness.

## CLASS ACTION ALLEGATIONS

84. Plaintiffs seek certification of the following Class:

All natural persons who reside in the United States as of April 16, 2012, and who:

a.    Worked as "Clean-Up Workers," as defined in paragraph 85, at any time between April 20, 2010, and April 16, 2012;

b.    Resided in "Zone A," as defined in paragraph 86, for some time on each of at least sixty days between April 20, 2010, and September 30, 2010, and who developed a physical symptom or illness between April 20, 2010, and September 30, 2010 that is associated with exposure to oil/or dispersants or decontaminants; or

c.    Resided in "Zone B," as defined in paragraph 87, for some time on each of at least sixty days between April 20, 2010, and December 31, 2010.

85.    "Clean-up Workers" means all natural persons employed in connection with the clean-up, remediation efforts, and all other responsive actions, including the use and handling of dispersants or decontaminants, relating to the oil spill ("Response Activities"), including but not limited to:

a.    captains, crews, and other workers employed on VoO who performed Response Activities;

b.    workers employed to perform the decontamination of vessels involved in Response Activities;

c.    captains, crew, and other workers on vessels other than VoO that performed Response Activities;

d.    onshore personnel employed to perform Response Activities; and

e.    persons involved in the recovery, transport, and decontamination of wildlife affected by the Oil Spill.

86.    "Zone A" is the beachfront areas along the Gulf Coast approximately one-half mile inland from the shoreline, from Grand Isle, Louisiana, to Dog Island, Florida.

87.     "Zone B" is the area of wetlands along the Gulf Coast at least one mile inland from the shoreline from Vermilion Parish in Louisiana to Mobile County in Alabama.

88.     Excluded from the Class are:

a.      Class members who request exclusion from the class;

b.      individuals employed by BP at any time between April 20, 2010, and April 16, 2012;

c.      judges on the United States District Court for the Eastern District of Louisiana, and their law clerks serving on or after April 20, 2010 through April 16, 2012; and

d.      individuals who were on the *Deepwater Horizon* on April 20, 2010;

e.      individuals who previously asserted and released their claims against BP relating to any illnesses or injuries suffered as a result of exposure to oil and other hydrocarbons from the Macondo well and/or dispersants and/or decontaminants used in connection with the Response Activities; and

f.      individuals who are Zone A or B residents, but are not Clean-Up Workers, and who worked in one or more of the following capacities for a cumulative duration of at least five years prior to April 20, 2010:

  i.      cleaning or reconditioning of the tanks or holds of barges, tankers or lighters, tanker trucks, tanker rail cars, or any other tank (stationary or mobile) used to hold hydrocarbons or petrochemicals;

  ii.     storage, handling, or cleaning of naturally occurring radioactive materials ("NORMs"), including radionuclides;

  iii.    storage, transportation, distribution, or dispensing of gasoline, diesel, jet fuel, kerosene, motor fuels, or other hydrocarbon-based fuels at any bulk storage facility (not including gas stations or gas station convenience stores), bulk plant, or bulk terminal facility that stores hydrocarbons or petrochemicals;

iv.       loading or unloading bulk crude oil or petroleum hydrocarbons onto or from trucks, ships, barges, or other vessels; or

v.       tar distillation.

89.    This action is brought and may properly be maintained as a class action on behalf of the proposed Class as described above, and such other additional classes as Plaintiffs may propose and/or the Court may designate, pursuant to the applicable and appropriate provisions of Rule 23(a)(1)-(4) and (b)(3).

**A.     Numerosity of the Class – Fed. R. Civ. P. 23(a)(1)**

90.    On information and belief, the Class consists of over 100,000 individuals. It is so numerous that joinder of all members is impossible. Class members can be informed of the pendency of this action by print, internet, and broadcast notice. Many will also receive notice by U.S. mail.

**B.     Commonality – Fed. R. Civ. P. 23(a)(2)**

91.    There are numerous questions of law and fact common to all Class members. Because Defendants' conduct here is governed by federal regulations and federal maritime law, the Class members will be subject to common questions of law.

92.    Furthermore, the factual bases of Defendants' outrageous conduct are common to all Class members and represent a common thread of reckless conduct, gross negligence and willful, wanton, and reckless indifference for the rights of others, resulting in injury to all members of the Class. The Class members' claims arise from the same course of decision-making and events, and each Class member will make similar legal and factual arguments to prove Defendants' outrageous, willful, reckless, wanton, and deplorable conduct and liability.

93.     Furthermore, the Class members' claims depend upon a common contention—namely, BP's liability for the *Deepwater Horizon* explosion and the subsequent release of oil.  The liability proceeding will generate common answers apt to drive the resolution of Plaintiffs' negligence action.  This common issue would therefore resolve a question that is central to the validity of each one of the Class member's claims.

94.     Among the common legal and factual questions presented by BP's conduct are:

a.     the facts surrounding the explosion and fire onboard the *Deepwater Horizon* that eventually caused the vessel to sink, and the release of oil and other substances from the Macondo well and/or the *Deepwater Horizon* and its appurtenances;

b.     whether BP owed a duty to Class members in the operation of the *Deepwater* Horizon and Macondo well;

c.     the facts concerning the types of injuries caused by exposure to oil and/or dispersants;

d.     whether BP owed a duty of care to Class members in the use of dispersants and/or other hazardous chemicals and other efforts to respond to the Oil Spill;

e.     whether BP recklessly, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and to prevent injuring Plaintiffs;

f.     whether BP breached duties of care to Class members by causing and/or allowing the Oil Spill to occur and remain ongoing for months through its actions and omissions in conducting Response Activities; and

g.     whether BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its attempt to respond to the Oil Spill, and thereby exacerbated the pollution of the Gulf of Mexico and injury to Plaintiffs.

95.     Common questions of law and fact also exist with respect to Defendants' punitive damages liability to the Class, including Defendants' outrageous, grossly

negligent, willful, reckless, and wanton conduct; the calculation of the amount of punitive damages that may be imposed upon each of the Defendants consistent with due process; intra-class equity with respect to the allocation and utilization of punitive damages; and the most practicable and most equitable allocation, disbursement, and utilization of such damages for punishment of Defendants' wrongful conduct toward Plaintiffs, the Class, and society, and in fulfillment of the deterrent policy and purpose of punitive damages.

C.     **Typicality – Fed. R. Civ. P. 23(a)(3)**

96.     The claims in this Medical Class Action Complaint are typical of the claims of the Class in that the representative Plaintiffs are members of the Class and, like all Class members, were placed at risk of adverse health effects and/or other harms caused by exposure to oil, dispersants and/or other hazardous chemicals used for or resulting from the Oil Spill and suffered injury as a result of BP's tortious conduct.

97.     Each Class member's claim arises from the same decision-making and events, and each Class member will make similar legal and factual arguments to prove BP's negligent, outrageous, grossly negligent, willful, reckless, and wanton conduct and liability under the same legal theories asserted in herein.

D.     **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4)**

98.     Plaintiffs will fairly and adequately represent and protect the interest of the Class.  Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort and complex class actions, including actions involving environmental contamination.  Among the undersigned counsel for Plaintiffs are counsel who represent claimants from each of the affected Gulf states and counsel with experience in complex class action litigation and trials.  Plaintiffs and their counsel are

committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

      **E.**    **Class Certification under Fed. R. Civ. P. 23(b)(3) – Predominance and Superiority**

99.    Common issues of fact and law predominate concerning the claims of the Class.

100.    Defendants' conduct presents predominant common factual questions. Fundamentally, all Plaintiffs' claims arise out of a single course of conduct that caused the Macondo well blowout, the *Deepwater Horizon* explosions, and the subsequent Oil Spill.  Although this is a single-event, single-location mass disaster that has affected, and will continue to affect a large geographic area and many individuals for some time to come, its wide-ranging effects can be traced back to a single root: a chain of decisions and actions made jointly, severally, and solidarily by the small group of actors limited to the BP Defendants and the Transocean and Halliburton Defendants identified in the operative B3 Master Complaint.  Furthermore, the decisions made during the Response Activities—how to cap the flow of oil from the Madondo well, to apply dispersant, and to widely deploy Clean-Up Workers who were ill-equipped for exposure to oil and harmful chemicals, for example—were centralized and made by BP.  Plaintiffs will present common proof with respect to BP's failure to use best practices in responding to the spill; this proof is the same for each member of the Class.  What is more, Plaintiffs' proof of Defendants' outrageous, grossly negligent, willful, reckless, and wanton conduct will involve the same individuals, events, discovery, documents, fact witnesses, and experts. Common questions of fact also predominate concerning the determination of the

aggregate quantum of punitive damages necessary to fulfill the punishment and deterrence goals of such damages.

101.     Because Defendants' behavior here is governed by federal regulations and federal maritime law, the Class members will be subject to common questions of law and such questions will predominate over any individual issues.

102.     A class action is superior to the only other method available for the fair and efficient adjudication of this controversy—litigation via multiple trials.   The repetitive individual litigation of Defendants' conduct by all members of the Class is inefficient, impracticable, economically infeasible, and potentially unfair, particularly in light of the unique context of Defendants' course of conduct and its unprecedented impact upon the Class, the environment, economy, and society.   Given the compensatory and other damages of each Class member's case, few individual Class members could afford to shoulder the litigation costs of a complex matter such as this, which in turn means that few could likely seek their rightful legal recourse.   Absent a class action, Class members would continue to incur harm without remedy.

103.     It would be unduly burdensome on the courts to oversee the individual re-litigation of the same facts and legal issues in thousands of cases.   The consideration of common questions of fact and law via this class action will conserve judicial resources and promote a fair and consistent resolution of these claims.

## CAUSES OF ACTION

### A.     Negligence Under General Maritime Law

104.     Plaintiffs, individually and on behalf of the proposed Class, reallege each and every allegation set forth in all preceding paragraphs as if fully restated here.

105.    The existence and breach of Defendants' legal duties are established under general maritime law.

106.    At all times material hereto, Defendants owed duties of ordinary and reasonable care to Plaintiffs and the Class in connection with the drilling operations and maintenance of the *Deepwater Horizon*, including its appurtenances and equipment.  BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

107.    Further, BP owed a duty to Plaintiffs and the Class to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

108.    BP had a heightened duty of care to Plaintiffs and the Class because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

109.    The risk of injury and loss to Plaintiffs and the Class was reasonably foreseeable, and BP knew of the dangers associated with deep water drilling. Specifically, at all times relevant to this litigation, BP knew or should have known that:

   a.    crude oil contains chemicals hazardous to human health;

   b.    chemical dispersants contain chemicals hazardous to human health;

   c.    Plaintiffs and the Class should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances that they contain; and

   d.    failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiffs.

110. BP breached its duty of care to the Plaintiffs and the Class in the following non-exclusive respects:

a. failing to prevent the explosion on board the *Deepwater Horizon*;

b. failing to cap the Macondo well in a timely manner;

c. failing to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

d. failing to properly train and equip Clean-Up Workers to avoid exposure to hazardous substances encountered in connection with relief efforts;

e. failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

f. failing to coordinate and conduct aerial spraying sorties in a manner so as to eliminate the risk of vessels and crewmembers being exposed to aerial chemical dispersants; and

g. failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

111. The blowout and explosions on the *Deepwater Horizon,* its sinking and the resulting spill were caused by the joint and concurrent negligence of the BP Defendants and the Transocean and/or Halliburton Defendants named in the operative B3 Master Complaint.

112. Defendants' breach of their duties posed an unreasonable risk of harm to Plaintiffs and the Class.

113. Plaintiffs and the Class suffered injury, loss, and damages as a direct and proximate result of Defendants' breach of their aforementioned duties.

114. Furthermore, as an element of damages, Plaintiffs and Class members are entitled to medical monitoring relief. Plaintiffs' exposure to oil and harmful chemicals

may lead to serious health problems, diseases, and medical conditions that may be prevented or minimized by timely medical diagnosis and treatment.

115.    Monitoring procedures exist that make possible the early detection of any latent disease.  Such procedures are reasonably necessary will be of great benefit to Plaintiffs and the Class by preventing or minimizing health problems that Plaintiffs and the Class may encounter as a result of the Oil Spill and related Response Activities.

116.    In order to reach maximum medical improvement, Plaintiffs and the Class are entitled to a monitoring protocol.  Defendants' failure to provide such a protocol is callous, willful, wanton, or otherwise tortious.

### B.    Gross Negligence Under General Maritime Law

117.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

118.    Defendants had a heightened duty of care to Plaintiffs because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

119.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to prevent and contain the Oil Spill.

120.    Defendants knew or should have known that their willful, wanton, and reckless conduct would cause injury to Plaintiffs and the Class.

121.    Defendants' willful, wanton, reckless, and/or grossly negligent conduct is the factual and legal cause of Plaintiffs' and the Class's injuries and damages.  Similarly, for the reasons set forth above, Plaintiffs and the Class are entitled to medical monitoring relief as an element of damages for Defendants' gross negligence.

### C.      Negligence *Per Se* Under General Maritime Law and Federal Law

122.    Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

123.    Defendants' conduct with regard to the manufacture, maintenance and/or operation of oil-drilling vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by federal laws and permits issued under the authority of these laws.  These laws and permits create statutory and regulatory standards that are intended to protect and to benefit Plaintiffs, including, but not limited to, those that govern the National Oil and Hazardous Substances Contingency Plan, *see, e.g.*, 40 C.F.R. § 300.150. BP failed to adhere to the requirements for response actions established by the National Contingency Plan, 29 C.F.R. § 1910.120.   BP therefore breached its responsibilities under this regulatory provision.

124.    In addition, the federal Bureau of Safety and Environmental Enforcement ("BSEE") found that BP violated the following federal regulations:

   a.      BP failed to protect health, safety, property, and the environment by failing to perform all operations in a safe and workmanlike manner, in violation of 30 C.F.R. § 250.107(a)(1);

   b.      BP did not take measures to prevent unauthorized discharge of pollutants into offshore waters, in violation of 30 C.F.R. § 250.300;

   c.      BP failed to take necessary precautions to keep the well under control at all times, in violation of 30 C.F.R. § 250.401(a);

   d.      BP did not cement the well in a manner that would properly control formation pressures and fluids and prevent the direct or indirect release of fluids from any stratum through the wellbore into offshore waters, in violation of 30 C.F.R. §§ 250.420(a)(1) and (2);

e.   BP failed to conduct an accurate pressure integrity test, in violation of 30 C.F.R. § 250.427;

f.   BP failed to maintain the *Deepwater Horizon*'s BOP system in accordance with the American Petroleum Institute's Recommended Procedure 53 section 18.10.3, in violation of 30 C.F.R. § 250.446(a);

g.   BP failed to obtain approval of the Temporary Abandonment procedures it actually used at the Macondo well, in violation of 30 C.F.R. § 250.1721(a);

h.   BP failed to conduct an accurate pressure integrity test at the 13-5/8" liner shoe, in violation of 30 C.F.R. § 250.427; and

i.   BP failed to suspend drilling operations at the Macondo well when the safe drilling margin identified in the approval application for the permit to drill was not maintained, in four separate violations of 30 C.F.R. § 250.427(b).

125.   BP's violations of these statutory and/or regulatory standards constitute negligence *per se* under federal law, as well as general maritime law.

126.   BP had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein, which in turn caused Plaintiffs' and the Class's injuries, and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

127.   As a direct and proximate cause of BP's violation of statutory and/or regulatory standards, the Plaintiffs and the Class have suffered injuries and are entitled to damages, including, *inter alia*, costs of medical monitoring.

**D.    Medical Monitoring Claim Under General Maritime Law**

128.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

129.   The law governing medical monitoring in a number of jurisdictions is consistent with both the general common law and the remedial purposes underlying the general maritime law.  Accordingly, the general maritime law should recognize a cause

of action for medical monitoring relief other than lump sum damages, irrespective of whether a particular Plaintiff or Class member has manifested a bodily injury to date.

130.   Plaintiffs have been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

131.   Plaintiffs' exposures were caused by Defendants' negligence or otherwise tortious conduct.

132.   As a direct and proximate result of their exposure, many Plaintiffs have manifested a physical injury or illness.   All Plaintiffs, however, have developed a significantly increased risk of future injury.

133.   The method and means for diagnosing Plaintiffs' potential medical problems exist and are well-accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems.   Such procedures enable the early detection of any future injury that are different from those normally recommended in the absence of the exposure.

134.   The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

135.   Defendants' failure to provide benefits such as those described above has been callous, willful, wanton, or otherwise tortious.

### E.   <u>Punitive Damages</u>

136.   Plaintiffs reallege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

137.   Defendants recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

138.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico, and needlessly caused injury to Gulf residents.

139.    Defendants' willful, wanton and reckless conduct, as described herein, entitles Plaintiffs to punitive damages.  The amount of punitive damages recoverable by Plaintiffs is not lawfully limited to the amount of their compensatory damages, but rather should be a multiplier of the same sufficient to both punish Defendants and deter similar wrongdoing in the future.

140.    BP engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in its activities leading up to and/or during the blowout, explosions, fire, and Oil Spill that an award of punitive damages against it at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.  BP's actions herein were not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to itself.  Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by BP's misconduct.

141.    BP's conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time it:

a.      failed to properly maintain and/or operate the *Deepwater Horizon*;

     b.     operated the *Deepwater Horizon* in such a manner that the safety and integrity of the vessel and the well were disregarded to save time and money;

     c.     ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

     d.     failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the *Deepwater Horizon*;

     e.     violated MMS regulations and/or other applicable regulations/standards for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

     f.     failed to take appropriate action to avoid or mitigate the accident;

     g.     failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

     h.     failed to ensure that the *Deepwater Horizon* and its equipment were free from defects, properly maintained and/or in proper working order;

     i.     failed to provide appropriate disaster prevention equipment; and

     j.     failed to have an appropriate emergency spill response plan or readily available spill response equipment.

142.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the proposed Class demand judgment against BP as follows:

1. certification of the Class under Fed. R. Civ. P. 23 and appointment of Plaintiffs as Class representatives and their counsel as Class Counsel;

2. compensatory damages in amounts to be determined at trial;

3. punitive damages;

4. implementation of a medical screening and monitoring program to be funded by BP;

5. pre-judgment and post-judgment interest at the maximum rate allowable by law;

6. attorneys' fees and costs of litigation;

7. any other and further relief the Court deems just and proper.

Dated: April 16, 2012

Respectfully submitted,

|  |  |
|---|---|
| ___/s/   Stephen J. Herman_____ | ____/s/ James Parkerson Roy_____ |
| Stephen J. Herman, La. Bar No. 23129 | James Parkerson Roy, La. Bar No. 11511 |
| HERMAN HERMAN KATZ & COTLAR LLP | DOMENGEAUX WRIGHT ROY & EDWARDS LLC |
| 820 O'Keefe Avenue | 556 Jefferson Street, Suite 500 |
| New Orleans, Louisiana 70113 | Lafayette, Louisiana 70501 |
| Telephone: (504) 581-4892 | Telephone: (337) 233-3033 |
| Fax No. (504) 569-6024 | Fax No. (337) 233-2796 |
| E-Mail: sherman@hhkc.com | E-Mail: jimr@wrightroy.com |
| *Plaintiffs' Liaison Counsel,* | *Plaintiffs' Liaison Counsel,* |
| *Interim Class Counsel, and* | *Interim Class Counsel, and* |
| *Proposed Lead Class Counsel* | *Proposed Lead Class Counsel* |

**PLAINTIFFS' STEERING COMMITTEE
AND PROPOSED MEDICAL CLASS COUNSEL**

| | |
|---|---|
| Brian H. Barr<br>LEVIN, PAPANTONIO, THOMAS, MITCHELL,<br>ECHSNER & PROCTOR, PA<br>316 South Baylen St., Suite 600<br>Pensacola, FL 32502-5996<br>Office: (850) 435-7045<br>Telefax: (850) 436-6187<br>E-Mail: bbarr@levinlaw.com | Robin L. Greenwald<br>WEITZ & LUXENBERG, PC<br>700 Broadway<br>New York, NY 10003<br>Office: (212) 558-5802<br>Telefax: (212) 344-5461<br>E-Mail: rgreenwald@weitzlux.com |
| Jeffrey A. Breit<br>BREIT DRESCHER IMPREVENTO & WALKER<br>999 Waterside Drive, Suite 1000<br>Norfolk, VA 23510<br>Office: (757) 670-3888<br>Telefax: (757) 670-3895<br>E-Mail: jbreit@bdbmail.com | Rhon E. Jones<br>BEASLEY, ALLEN, CROW, METHVIN, PORTIS &<br>MILES, P. C.<br>218 Commerce St., P.O. Box 4160<br>Montgomery, AL 36104<br>Office: (334) 269-2343<br>Telefax: (334) 954-7555<br>E-Mail: rhon.jones@beasleyallen.com |
| Elizabeth J. Cabraser<br>LIEFF, CABRASER, HEIMANN &<br>BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111-3339<br>Office: (415) 956-1000 | Matthew E. Lundy<br>LUNDY, LUNDY, SOILEAU & SOUTH, LLP<br>501 Broad Street<br>Lake Charles, LA 70601<br>Office: (337) 439-0707<br>Telefax: (337) 439-1029 |

Telefax: (415) 956-1008
E-Mail:  ecabraser@lchb.com

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA & TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA  70037
Office:  (504) 394-9000
Telefax: (504) 394-9110
E-Mail:  pcossich@cossichlaw.com

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL  36660
Office:  (251) 471-6191
Telefax: (251) 479-1031
E-Mail:  rtc@cunninghambounds.com

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399
E-Mail:  mike@mikespy.com

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA  70726
Office: (225) 664-4193
Telefax: (225) 664-6925
E-Mail:  calvinfayard@fayardlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444
E-Mail:  ervin@colson.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Office: (843) 216-9159
Fax No. (843) 216-9290
E-Mail: jrice@motleyrice.com

E-Mail:  mlundy@lundylawllp.com

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGE'
618 Main Street
Baton Rouge, LA  70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522
E-Mail: mpalmintier@dphf-law.com

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW & ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA  70130
Office:  (504) 588-1500
Telefax:  (504) 588-1514
E-Mail:  sterbcow@lksalaw.com

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Office:  (214) 521-3605
Telefax: (214) 599-1172
E-Mail:  ssummy@baronbudd.com

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501
E-Mail:  mcwatts@wgclawfirm.com

Conrad S.P. "Duke" Williams
WILLIAMS LAW GROUP
435 Corporate Drive, Suite 101
Maison Grand Caillou
Houma, Louisiana 70360
Office: (985) 876-7595
Fax No. (985) 876-7594
E-Mail: duke@williamslawgroup.org

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that the above and foregoing has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, this 16th day of April, 2012.

_____/s/   Stephen J. Herman and James Parkerson Roy_____